**Opinion issued November 19, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-18-00683-CV**

————————————

**CITY OF HOUSTON, Appellant**

**V.**

**NAJLA HUSSEIN AND ASHA OBEID, Appellees**

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-81588**

---

## MEMORANDUM OPINION ON REHEARING

Appellant, City of Houston (the "City"), has a filed a motion for en banc

reconsideration of our March 19, 2019 memorandum opinion and judgment.[1]

---

[1]    *See* TEX. R. APP. P. 49.7.

Treating the motion for en banc reconsideration as a request for a panel rehearing,[2] we deny the motion for rehearing, withdraw our opinion and judgment of March 19, 2019, and issue this memorandum opinion and new judgment in their stead.[3] We dismiss the City's motion for en banc reconsideration as moot.[4]

In this interlocutory appeal,[5] the City, challenges the trial court's order denying its motion for summary judgment and its motion to dismiss the negligence suit against it by appellees, Najla Hussein and Asha Obeid (collectively, "appellees"). In two issues, the City contends that the trial court erred in denying its motion for summary judgment and its motion to dismiss appellees' claims against it.

We affirm in part and reverse and render in part.

---

[2] *See id.* 49.1.

[3] *See Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 757 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (treating motion for en banc reconsideration as request for panel rehearing, vacating original opinion and judgment, issuing new opinion and judgment in their stead, and dismissing motion for en banc reconsideration as moot); *see also Bechem v. Reliant Energy Retail Servs., LLC*, No. 01-18-00878-CV, 2019 WL 4065274, at *1 & n.2 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, pet. denied) (mem. op.).

[4] *See Wooters*, 513 S.W.3d at 757; *see also Bechem*, 2019 WL 4065274, at *1 & nn.2–3.

[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8), (9); *see also Thomas v. Long*, 207 S.W.3d 334, 339–40 (Tex. 2006) (motion for summary judgment challenging trial court's subject matter jurisdiction is subsumed under Texas Civil Practice and Remedies Code section 54.014(a)(8)); *City of Houston v. Garza*, No. 01-18-01069-CV, 2019 WL 2932851, at *3 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.) ("When a governmental unit asserts immunity in a motion for summary judgment, a court of appeals has jurisdiction to review an interlocutory order denying summary judgment.").

## Background

In their second amended petition, appellees allege that on May 26, 2016, they were riding in a City ambulance, driven by Antonio Camacho, an employee of the City, when the ambulance suddenly, and without warning, struck the concrete barrier of a toll booth. Appellees were "toss[ed]" as a result, and both suffered personal injuries.

Appellees bring negligence claims against the City, asserting that Camacho was negligent in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed. According to appellees, each of Camacho's acts or omissions proximately caused their injuries and damages. Appellees each sought damages for past and future physical pain and mental anguish, past and future medical care and expenses, and past and future pain and suffering.

The City answered, generally denying the allegations in appellees' petition and asserting "governmental immunity . . . as an affirmative defense."

The City then moved for summary judgment, arguing that it was entitled to judgment as a matter of law because the trial court lacks subject-matter jurisdiction

over appellees' suit.[6] The City asserted that it is a governmental entity under the Texas Tort Claims Act ("TTCA"), and thus, it is entitled to governmental immunity. The City acknowledged that the TTCA waives governmental immunity for personal injuries proximately caused by the negligence of a governmental employee acting in the scope of his employment where the injury "arises from the operation or use of a motor-driven vehicle."[7] But, in this case, it asserted that the "emergency exception" applies and preserves the City's immunity.[8]

The City also moved to dismiss appellees' negligence claims against it, asserting that appellees had alleged health care liability claims, they had failed to serve a statutorily-required expert report, and the trial court had to dismiss their claims.[9]

The City attached to both motions the affidavit of Camacho, Obeid's response to the City's first set of interrogatories, and Obeid's response to the City's first set of admissions. In his affidavit, Camacho testified that he is a certified paramedic and provides "advanced life support care." On May 26, 2016, he was the engineer/operator of Houston Fire-EMS ambulance M003. As part of his job duties,

---

[6] *See Thomas*, 207 S.W.3d at 339–40 (trial court's subject-matter jurisdiction may be challenged by motion for summary judgment).

[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1).

[8] *See id.* § 101.055(2).

[9] *See id.* §§ 74.001(a)(13) (defining "[h]ealth care liability claim" (internal quotations omitted)), 74.351(a), (b).

4

he operated units to emergencies using lights and sirens, retrieved equipment, assisted and supervised the in-charge caregiver who provided care to patients, maintained a safe scene, mitigated risk at a scene, called for additional resources as necessary, and transported patients to facilities in a timely manner.  On May 26, 2016, at 12:37 p.m., his ambulance, with its emergency lights and siren activated, was dispatched to Obeid's home because Obeid was suffering from chest pains—a complaint that was "always treated as [a] worst-case scenario:  a heart attack."

Upon arrival at Obeid's home at 12:52 p.m., Obeid complained of chest pain and rated her pain as an eight out of ten.  At 12:58 p.m., an electrocardiogram ("EKG") performed at Obeid's home showed that she was experiencing atrial fibrillation.  According to Camacho, atrial fibrillation means that "the upper chamber of the heart (the atrium) is quivering" and atrial fibrillation can cause clots, which "c[an] travel to the brain and cause a stroke, travel to the lungs and cause a pulmonary embolism ("PE")[,] or travel to the heart" and cause a heart attack. Camacho stated that such conditions are immediately life-threatening, so when a patient has atrial fibrillation with a heart rate of more than 150 beats per minute, paramedics treat the patient's condition as a life-threatening emergency.  When a patient has atrial fibrillation with a heart rate of less than 150 beats per minute, paramedics treat the patient's condition as urgent, but not critical.  And if a patient has atrial fibrillation, but a normal heart rate, transportation to a hospital is still

5

required because paramedics are unable to ascertain whether a patient is having a PE, a heart attack, or is suffering from a more serious condition. Even a patient with atrial fibrillation who is stable must be transported to a hospital with "some urgency" because she "could deteriorate rapidly." Camacho notes that women can experience a heart attack but still have normal EKG results, so transport to a hospital is necessary for further testing.

At 1:11 p.m., Camacho's ambulance left Obeid's home to transport Obeid to the hospital. While transporting Obeid, the ambulance's emergency lights and siren were not engaged. According to Camacho, emergency lights and siren were not necessary because Obeid's heart rate was a normal rate and her pacemaker "was doing its job." And although the paramedics needed to transport Obeid to a hospital with "some urgency," neither Obeid's condition nor the time of day required the use of the ambulance's emergency lights and siren. Camacho explained that he did not need to drive "extra fast" and "in a manner that [would] pose[] a greater risk to the public at large." And traffic was not "heavy" while he was driving.

Camacho further testified that Obeid's home was "equidistant from two hospitals that c[ould] provide [her with] cardiac care"—Memorial Hermann Memorial City Medical Center ("Memorial Hermann Memorial City") and Memorial Hermann Southwest Hospital ("Memorial Hermann Southwest"). Initially, Camacho started driving toward Memorial Hermann Memorial City, but

6

Obeid "requested . . . [a] change [of] course" because she had previously been treated at Memorial Hermann Southwest. Upon Obeid's request, Camacho "had to make a very quick decision to exit the tollway [on which he was driving] and change direction." Because the exits on the tollway were limited, "missing [an] exit would have added 15 minutes" onto the drive to the hospital. When trying to exit, Camacho chose a lane that had the fewest cars in line at an upcoming toll booth. But, as he approached the toll booth in the ambulance, he saw a sign that said that the lane he had selected was only to be used by "narrow cars." He then stopped the ambulance. He could not change lanes because the barrels connected by a cable in front of each toll booth prevented cars from doing so. He considered backing up the ambulance far enough to change lanes, but he believed that by doing so, he "would . . . pose[] a significant risk to other drivers exiting the tollway" because of his limited ability to see behind the ambulance while driving. He believed that "backing up" the ambulance was the "riskier option." Thus, he decided to drive the ambulance forward at approximately five miles per hour "to minimize the impact if the ambulance were to collide with the toll booth."

As Camacho drove through the toll booth, he used the ambulance's side mirrors to ascertain whether the ambulance would fit through the "narrow" lane. Although the side mirrors "cleared" the toll booth, unbeknownst to Camacho, the lane was narrower at the bottom "so the bottom of the ambulance hit the toll booth."

According to Camacho, about two minutes passed between the time Obeid told him to take her to Memorial Hermann Southwest and the time the ambulance hit the toll booth.

In Obeid's response to the City's first set of interrogatories, she states that Hussein called for emergency assistance on her behalf because she was experiencing chest pains and thought she was having a heart attack. Obeid also states that as a result of the ambulance hitting the toll booth, she sustained injuries to her neck, chest, left shoulder, back, and knee.

In her response to the City's first set of admissions, Obeid admits that she was experiencing chest pains on May 26, 2016 at the time the call for emergency assistance was made. She also admits that she believed, at that time, that her life could be in danger, she needed urgent medical assistance, and she believed "the situation to be an emergency." Additionally, she admits that she saw "flashing lights" and heard sirens when the ambulance arrived at her home. And that she was later in the ambulance so that she could be transported to the hospital. Obeid denied that she was "being transported to a hospital in the ambulance because [she] needed urgent medical assistance."

In response to the City's summary-judgment motion,[10] appellees asserted that they had pleaded facts in their petition to adequately show waiver of governmental immunity under the TTCA.[11] They alleged that they were injured by the negligence of Camacho, a City employee who was operating a motor vehicle, and the City had failed to conclusively prove that the TTCA's "emergency exception" applied to their claims.[12] According to appellees, at the very least, a fact issue existed as to whether the TTCA's "emergency exception" applied because no emergency situation existed at the time of the actual collision between the ambulance and the toll booth and Camacho acted with conscious indifference or reckless disregard for the safety of others.

In response to the City's motion to dismiss, appellees argued that they did not have to serve a statutorily-required expert report because they had not alleged a health care liability claim. Appellees also asserted that even if Obeid's claim constituted a health care liability claim, Hussein's claim did not.

Appellees attached to their response a declaration from Obeid, a declaration from Hussein, and a Texas Peace Officer's Crash Report. In her declaration, Obeid stated:

---

[10]  Appellees filed a joint response to the City's motion for summary judgment and motion to dismiss.

[11]  *See id.* § 101.021(1).

[12]  *See id.* § 101.055(2).

9

On May 26, 2016, I was at home with my daughter when I began to experience chest pains. My daughter, . . . Hussein, called 911 to the apartment to ensure that I was ok. The ambulance arrived at my apartment with lights and sirens on.

My apartment is approximately 3.5 miles from Memorial Hermann Southwest, which is why it is my preferred hospital. Memorial Hermann Memorial City is farther, approximately 7 miles from my apartment.

The ambulance did not have its lights or sirens on during the drive to [the hospital]. During the ride, I was breathing normally and fully alert to my surroundings. All medical treatment provided to me in the ambulance was by the paramedic, Rafiq Cooper, and possibly the interns. . . . Camacho was the driver of the ambulance but did not provide medical treatment to me.

Based upon the sounds that I heard, the feel of the vehicle moving, and the impact I felt, the ambulance was moving at approximately 20 miles per hour upon impact with the barrier. From the impact, I received bruising and abrasions to my left hand.

In her declaration, Hussein stated:

On May 26, 2016, I was at home with my mother, . . . Obeid, when she began to experience chest pains. I then called 911 to come to the apartment and check her out. The ambulance arrived to [the] apartment with lights and sirens on.

[The] apartment is approximately 3.5 miles from Memorial Hermann Southwest. Memorial Hermann Memorial City is farther, approximately 7 miles from [the] apartment.

The ambulance did not have its lights or sirens on during the drive to [the hospital]. While in the ambulance, [Obeid] was responsive, breathing normally, and did not appear to be in any distress. . . . Camacho was the driver of the ambulance but did not provide medical treatment to [Obeid].

10

At no time was I under the medical care of the ambulance personnel, or anyone else. I received no medical treatment whatsoever while at the apartment or in the ambulance. At no time was I providing, or assisting in providing, any health care to any person.

Based upon the sounds that I heard, the feel of the vehicle moving, and the impact I felt, the ambulance was moving at approximately 20 miles per hour when it struck the barrier wall. At the moment of impact, I was knocked to the floor of the ambulance and sustained injuries.

The Texas Peace Officer's Crash Report states that there were six people in the ambulance, a City of Houston and Houston Fire Department government vehicle, at the time of the crash: (1) Camacho—the driver, (2) Obeid, (3) Hussein, (4) Cooper—a paramedic, (5) Desmond Miller, and (6) Rodney Manning. Obeid, Hussein, Cooper, Miller, and Manning were all in the back of the ambulance at the time of the crash. Obeid was "hooked [up] to [an] IV for heart treatment." The "Investigator's Narrative Opinion of What Happened" states that the ambulance, an oversized vehicle, was driving in a northbound lane and passing through a toll booth when it struck the right concrete barrier before the toll booth. The report notes that the concrete barrier before the toll booth was damaged. After the crash, Obeid was transported to Memorial Hermann Southwest "for [a] heart problem unrelated to [the] collision." (Internal quotations omitted.) The report also includes an un-checked box stating: "Pol., Fire, EMS on Emergency (Explain in Narrative if Checked)."

11

The report includes statements from certain individuals. For instance, Camacho stated: "While transporting a patient to . . . Memorial Hermann [Southwest] . . . [I] tried to go through [a] toll road lane but could not fit through [the] lane and hit [a] barrier on the right side of the ambulance." (Internal quotations omitted.) And Hussein stated:

> I called the ambulance around 12 pm for my mother . . . Obeid['s] chest pain. After checking we were going to [Memorial Hermann] Memorial City . . . we wanted to go to Memorial H[e]rmann Southwest and the driver tr[ied] to get into the small EZ tag lane and we hit the wall from both sides. The ambulance . . . was stuck there. I [remember] falling into the ground and hurting my belly and both [of] my knees and [Obeid] hurt her hand and couldn't breathe and [had] back pain [and] her head hurt[]. [Obeid] had [a] seatbelt on, but I didn't since no one told me to.[13]

(Internal quotations omitted.)

After the City replied to appellees' response, the trial court denied the City's motion for summary judgment and motion to dismiss appellees' claims against it.

## Summary Judgment

In its first issue, the City argues that the trial court erred in denying its motion for summary judgment because the trial court lacks subject matter jurisdiction. The City argues that the TTCA does not waive governmental immunity in this case

---

[13] The report states that Hussein's statement was a joint statement for her and Obeid because Obeid, at the time, was "hooked [up] to [an] IV for heart treatment."

because the "emergency exception" applies. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021(1), 101.055(2).

We review a trial court's decision on summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). To prevail on a summary-judgment motion, a movant has the burden of establishing that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). "If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment." *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). A genuine issue of material fact exists if the record evidence "would enable reasonable and fair-minded people to differ in their conclusions." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (internal quotations omitted). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the nonmovant and any doubts must be resolved in the nonmovant's favor. *Id.* at 549.

Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money

damages. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008). Although the terms "sovereign immunity" and "governmental immunity" are often used interchangeably, sovereign immunity "extends to various divisions of state government, including agencies, boards, hospitals, and universities," while governmental immunity "protects political subdivisions of the State, including counties, cities, and school districts." *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdiv. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 324 (Tex. 2006); *City of Dallas v. Hillis*, 308 S.W.3d 526, 530 (Tex. App.—Dallas 2010, pet. denied) ("A municipality enjoys governmental immunity from suit and from liability for its governmental functions."). We interpret statutory waivers of governmental immunity narrowly, as the Legislature's intent to waive immunity must be clear and unambiguous. *Garcia*, 253 S.W.3d at 655. Absent an express waiver of immunity, courts do not have subject-matter jurisdiction over suits against the State or its political subdivisions. *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 221, 224–25 (Tex. 2004).

The TTCA provides a limited waiver of immunity for certain suits against governmental entities. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109; *Garcia*, 253 S.W.3d at 655; *Hinojosa v. Metro. Transit Auth. of Harris Cty.*, No. 01-17-00824-CV, 2018 WL 4131890, at *2 (Tex. App.—Houston [1st Dist.] Aug.

14

30, 2018, no pet.) (mem. op.); *Hillis*, 308 S.W.3d at 530. Here, the City is a governmental entity protected by governmental immunity, unless its immunity has been waived. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(B). Relevant to this case, the TTCA waives immunity for personal injuries proximately caused by the negligence of a government employee acting in the scope of his employment if the injuries "arise[] from the operation or use of a motor-driven vehicle."[14] TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1); *see also Hinojosa*, 2018 WL 4131890, at *2; *City of Beaumont v. Brocato*, No. 09-10-00473-CV, 2011 WL 4716296, at *3 (Tex. App.—Beaumont Oct. 6, 2011, no pet.) (mem. op.) ("[Generally], the Texas Tort Claims Act waives immunity for claims arising from the use of a motor-driven vehicle by a governmental entity's employee.").

The TTCA, however, lists circumstances in which its waiver provisions do not apply. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.051–101.067; *City of San Antonio v. Hartman*, 201 S.W.3d 667, 671–72 (Tex. 2006). Exempted from the TTCA's waiver of immunity are claims included in the TTCA's "emergency exception."[15] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2); *Galveston Cty.*

---

[14]    There appears to be no dispute about whether appellees' allegations establish a waiver of immunity under Texas Civil Practice and Remedies Code section 101.021(1). Appellees allege that they received personal injuries arising from the operation or use of a City ambulance by a City employee. *See Kaufman Cty. v. Leggett*, 396 S.W.3d 24, 30 (Tex. App.—Dallas 2012, pet. denied).

[15]    The underlying policy of the "emergency exception" to the TTCA's limited waiver of immunity is "to balance the safety of the public with the need for prompt

15

*Health Dist. v. Hanley*, No. 01-14-00166-CV, 2014 WL 6853608, at *2 (Tex. App.—Houston [1st Dist.] Dec. 4, 2014, no pet.) (mem. op.); *see also City of El Paso v. Hernandez*, 16 S.W.3d 409, 415 (Tex. App.—El Paso 2000, pet. denied) (section 101.055(2) allows governmental entity to retain its immunity even though waiver may exist under section 101.021). Under Texas Civil Practice and Remedies Code section 101.055(2), a governmental entity's immunity is not waived in a case where a claim arises "from the action of an employee while responding to an emergency call or reacting to an emergency situation if the [employee's] action is in compliance with the laws and ordinances applicable to emergency action."[16] *See*

---

response" from emergency-assistance personnel. *City of Amarillo v. Martin*, 971 S.W.2d 426, 429 (Tex. 1998); *see also City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 699 (Tex. App.—Austin 2005, no pet.). Imposing liability for a mere failure in judgment could deter emergency-assistance personnel from acting decisively and taking calculated risks. *See Martin*, 971 S.W.2d at 430; *Hudson*, 179 S.W.3d at 699. This would also "allow for judicial second guessing of the split-second and time-pressured decisions" emergency-assistance personnel are forced to make. *Hudson*, 179 S.W.3d at 699.

[16] Texas Civil Practice and Remedies Code section 101.055(2) also states that immunity is not waived in a case where a claim arises "from the action of an employee while responding to an emergency call or reacting to an emergency situation if the [employee's] action," in the absence of laws or ordinances governing emergency action, "is not taken with conscious indifference or reckless disregard for the safety of others." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2); *see also Hudson*, 179 S.W.3d at 699 n.4. Because the Texas Transportation Code governs the operation of emergency vehicles in situations like the one present in this case, the conscious indifference or reckless disregard provision in section 101.055(2) does not apply. *See Hudson*, 179 S.W.3d at 699 n.4; *see also Galveston Cty. Health Dist. v. Hanley*, No. 01-14-00166-CV, 2014 WL 6853608, at *5 (Tex. App.—Houston [1st Dist.] Dec. 4, 2014, no pet.) (mem. op.). To the extent that the City asserts that Camacho's "action [was] not taken with conscious indifference or

16

TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2); *see also Hanley*, 2014 WL 6853608, at *2; *Brocato*, 2011 WL 4716296, at *3 ("[T]he Texas Tort Claims Act does not waive governmental immunity for claims asserting only negligence arising from the action of a government employee who is responding to an emergency call or reacting to an emergency situation." (internal quotations omitted)).

Here, the law applicable is found in Chapter 546 of the Texas Transportation Code.  *See* TEX. TRANSP. CODE ANN. ch. 546 (governing operation of emergency vehicles); *see also Zapata v. City of Gonzales*, No. 13-18-00065-CV, 2020 WL 486489, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 30, 2020, no pet.) (mem. op.); *Juarez v. Harris Cty.*, No. 01-18-00690-CV, 2019 WL 5699741, at *7 (Tex. App.—November 5, 2019, no pet.) (mem. op.) ("[T]he relevant law governing the operation of emergency vehicles is found in the Transportation Code.").  Texas Transportation Code section 546.005 states that a driver of an emergency vehicle is not relieved of "the duty to operate the vehicle with appropriate regard for the safety of all persons" or of "the consequences of reckless disregard for the safety of others." *See* TEX. TRANSP. CODE ANN. § 546.005; *see also Juarez*, 2019 WL 5699741, at *8 ("[T]o recover damages from a collision resulting from the emergency operation of an emergency vehicle, a plaintiff must show reckless disregard for the safety of

---

reckless disregard for the safety of others," we need not address it.  *See* TEX. R. APP. P. 47.1.

17

others and establish that the emergency vehicle's operator committed an act that the operator knew or should have known posed a high degree of risk of serious injury." (internal quotations omitted)); *City of Houston v. Davis*, No. 01-13-00600-CV, 2014 WL 1678907, at *6 (Tex. App.—Houston [1st Dist.] Apr. 24, 2014, pet. denied) (mem. op.) ("[T]he Texas Supreme Court has held that although this provision imposes a duty to drive with due regard for others by avoiding negligent behavior, it only imposes liability for reckless conduct." (internal quotations omitted)); *Lafferty v. Jasper Cty. Sheriff's Dep't*, No. 09-13-00039-CV, 2013 WL 6146049, at *5 (Tex. App.—Beaumont Nov. 21, 2013, no pet.) (mem. op.). The action of an emergency-vehicle operator constitutes a reckless disregard for the safety of others when the operator knows or should have known that the action in question posed a high risk of serious injury to others. *See City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 700 (Tex. App.—Austin 2005, no pet.); *Smith v. Janda*, 126 S.W.3d 543, 545 (Tex. App.—San Antonio 2003, no pet.); *see also Hartman*, 201 S.W.3d at 672 n.19 (Court has often interpreted term "reckless disregard" "to require proof that a party knew the relevant facts but did not care about the result" (internal quotations omitted)). In other words, the standard "requires a showing of more than a momentary judgment lapse." *Juarez*, 2019 WL 5699741, at *8 (internal quotations omitted).

To meet its initial burden, the City was required to present evidence establishing that Camacho was responding to an emergency call or reacting to an emergency situation and that he acted in compliance with the law applicable to an emergency.[17] *See Hanley*, 2014 WL 6853608, at *3; *Hudson*, 179 S.W.3d at 700; *Durham v. Bowie Cty.*, 135 S.W.3d 294, 298 (Tex. App.—Texarkana 2004, pet. denied); *see also Brocato*, 2011 WL 4716296, at *3 (noting undisputed facts may establish emergency situation existed under section 101.055(2)).

The City first argues that the "emergency exception" preserves immunity in this case because Camacho, the driver at the time the ambulance hit the toll booth's concrete barrier, was continuing to respond to an emergency call by transporting appellees to a hospital emergency room as Obeid's condition still required immediate action. According to the City, Camacho did not stop responding to the emergency call until after the collision occurred and the medical care of Obeid was transferred to another ambulance. The City also argues that the "emergency

---

[17] The City asserts that because appellees did not argue to the trial court that Camacho failed to comply with the law applicable to an emergency, this Court need not address that requirement of the "emergency exception." *Cf. City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 (Tex. 2006) (because plaintiffs did not assert that any law or ordinance governed placement of barricades on street or that City's acts or omissions showed that it did not care what happened to motorists, Court only required to address whether City employees were reacting to emergency situation). Due to our disposition of the City's first issue, we need not address whether appellees waived or conceded the requirement that the City establish that Camacho acted in compliance with the law applicable to an emergency. *See* TEX. R. APP. P. 47.1.

exception" preserves its immunity because Camacho, at the time of the collision, was reacting to another emergency situation—appellees "were in the back of an ambulance, on their way to a hospital emergency room, after calling 911 because Obeid thought she was having a heart attack and the paramedics could not rule out that possibility."

The TTCA does not define the terms "emergency call" or "emergency situation," but Texas courts have interpreted the term "emergency" broadly. *See Zapata*, 2020 WL 486489, at *4; *Juarez*, 2019 WL 5699741, at *6; *see, e.g., Hartman*, 201 S.W.3d at 672–73 (although "emergency exception" provision has often been applied in connection with traffic accidents involving law enforcement, or emergency vehicles, concluding city's reaction to widespread roadway flooding constituted reaction to "an emergency situation"); *Pakdimounivong v. City of Arlington*, 219 S.W.3d 401, 410–11 (Tex. App.—Fort Worth 2006, pet. denied) (officers were responding to emergency situation when suspect in back of patrol car tried to escape through car window); *see also City of College Station v. Kahlden*, No. 10-12-00262-CV, 2014 WL 1269026, at *5 (Tex. App.—Waco Mar. 27, 2014, pet. denied) (mem. op.) (defining "emergency," in context of section 101.055(2), as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" (internal quotations omitted)); *Jefferson Cty. v. Hudson*, No. 09-11-00168-CV, 2011 WL 3925724, at *3 (Tex. App.—Beaumont Aug. 25, 2011,

no pet.) (mem. op.) (noting Legislature did not intend exception to apply only in limited circumstances and defining "emergency" as used in section 101.055(2) to "refer[] to unforeseen circumstances that call for immediate action" (internal quotations omitted)).

In his affidavit, Camacho, a certified paramedic, testified that he was the engineer/operator of a Houston Fire-EMS ambulance. As part of his job duties, he operated units to emergencies using lights and sirens, retrieved equipment, assisted and supervised the in-charge caregiver who provided care to patients, maintained a safe scene, mitigated risk at a scene, called for additional resources as necessary, and transported patients to facilities in a timely manner. On May 26, 2016, at 12:37 p.m., his ambulance, with its emergency lights and siren activated, was dispatched to Obeid's home because Obeid was suffering from chest pains—a complaint that was "always treated as [a] worst-case scenario: a heart attack."

Upon the ambulance's arrival at Obeid's home at 12:52 p.m., Obeid complained of chest pain and rated her pain as an eight out of ten. At 12:58 p.m., an EKG performed at Obeid's home showed that she was experiencing atrial fibrillation. According to Camacho, atrial fibrillation means that "the upper chamber of [Obeid's] heart (the atrium) [was] quivering" and atrial fibrillation could cause clots, which "could travel to the brain and cause a stroke, travel to the lungs and cause a . . . [PE]," or "travel to the heart" and cause a heart attack. Camacho stated

21

that when a patient has atrial fibrillation, but a normal heart rate, transportation to a hospital is required because paramedics are unable to ascertain whether the patient is having a PE, a heart attack, or is suffering from a more serious condition. Because such conditions are considered immediately life-threatening, even a patient with atrial fibrillation who is stable must be transported to a hospital with "some urgency" because she "could deteriorate rapidly." According to Camacho, women can experience a heart attack but still have normal EKG results, so transport to a hospital is necessary for further testing. At 1:11 p.m., Camacho's ambulance left Obeid's home to transport Obeid to the hospital with "some urgency."

In Obeid's response to the City's first set of interrogatories, she states that Hussein called for emergency assistance on her behalf because she was experiencing chest pains and thought she was having a heart attack. And in her response to the City's first set of admissions, Obeid admits that she was experiencing chest pains on May 26, 2016 at the time the call for emergency assistance was made. She also admits that, at the time the call for emergency assistance was made, she believed that her life could be in danger, she needed urgent medical assistance, and she believed "the situation to be an emergency." Additionally, she admits that she saw "flashing lights" and heard sirens when the ambulance arrived at her home. And that she was later in the ambulance at the time of the collision because she was being transported to a hospital.

The City's summary-judgment evidence shows that Camacho, a paramedic and the engineer/operator of an ambulance, responded, with emergency lights and siren activated, to the home of Obeid—a woman who had called for emergency assistance after experiencing chest pains, which she rated as an eight out of ten. Upon arrival, it was determined that Obeid was experiencing atrial fibrillation—a life-threatening condition which required her to be transported to a hospital with "some urgency" because it could result in a heart attack, a PE, or a stroke. And Obeid required further testing at a hospital. *See Harris Cty. v. Spears*, No. 14-17-00662-CV, 2018 WL 4571841, at *4–5 (Tex. App.—Houston [14th Dist.] Sept. 25, 2018, no pet.) (mem. op.) (emergency-response exception applied where law enforcement officer responded to medical emergency call that required immediate response); *Hanley*, 2014 WL 6853608, at *3 (ambulance responding to emergency-assistance call "for help pertaining to an unconscious and unresponsive woman"); *Quested v. City of Houston*, 440 S.W.3d 275, 284–85 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (considering nature of call to which law enforcement officer responded); *see also Hartman*, 201 S.W.3d at 672–73 (city reacting to emergency where, among other things, there was imminent threat of severe injury, loss of life or property due to city-wide flooding). We conclude that this evidence is sufficient to show that Camacho was responding to an emergency

call or reacting to an emergency situation at the time of the collision and the City met its initial burden. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2).

Because the City has met its burden, the burden then shifts to appellees to raise a genuine issue of material fact as to whether Camacho was responding to an emergency call or reacting to an emergency situation at the time of the collision. *See Juarez*, 2019 WL 5699741, at *7; *Spears*, 2018 WL 4571841, at *4. Appellees argue that at the time of the actual collision any emergency no longer existed because Obeid was stable, breathing normally, and communicating with paramedics while being transported in the ambulance, Camacho did not utilize the ambulance's emergency lights and siren while transporting Obeid to the hospital, Camacho initially tried to take Obeid to a hospital that was further away, and the City's "own employees admit [that] no emergency existed."

In his affidavit, Camacho testified that although the ambulance's emergency lights and siren were activated when it was initially dispatched to Obeid's home, when he later transported appellees to the hospital, he did not utilize the ambulance's emergency lights and siren because Obeid's condition did not require their use. Camacho also stated that Obeid's heart rate was normal at the time she was being transported to the hospital and her pacemaker "was doing its job." Camacho would have considered Obeid's condition to be a life-threatening emergency if her heart rate was more than 150 beats per minute, which it was not. Camacho also did not

need to drive "extra fast" while transporting Obeid to the hospital and Obeid's condition did not require Camacho to "pose[] a greater risk to the public at large." Camacho testified that he was able to communicate with Obeid while transporting her to the hospital and she was able to request "[a] change [of] course" and direct him to the hospital of her choice. Camacho complied with Obeid's request to change direction and to take her to the hospital she selected.

Here, a reasonable juror could conclude that engaging the ambulance's emergency lights and siren while in route to Obeid's home, but not activating those same lights and siren while transporting Obeid to the hospital, raised a fact issue as to whether Camacho was responding to an emergency call or reacting to an emergency situation at the time of the collision. *See Collins v. City of Houston*, No. 14-13-00533-CV, 2014 WL 3051231, at *7–8 (Tex. App.—Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.) (plaintiff presented fact issue as to whether law enforcement officer was responding to emergency call where evidence showed law enforcement officer did not have siren activated); *cf. Juarez*, 2019 WL 5699741, at *6–9 (in holding plaintiff failed to present evidence raising genuine issue of material fact as to whether law enforcement officers were reacting to emergency situation, noting officers had their emergency lights and sirens activated). And despite Camacho's explanation as to why he did not utilize the ambulance's emergency lights and siren on the way to the hospital—because Obeid's heart rate was normal,

25

her pacemaker "was doing its job," her condition did not require the emergency lights and siren to be activated, and there was no need to drive "extra fast"—a reasonable juror could conclude that these same facts indicate that Camacho was no longer responding to an emergency call or reacting to an emergency situation. Likewise, a reasonable juror could conclude that Camacho's decision, while in route to one hospital, to change course and proceed to a different hospital at the request of a patient, also raised a fact issue as to whether Camacho was responding to an emergency call or reacting to an emergency situation at the time of the collision.

Additionally, appellees in their declarations, state that Memorial Hermann Southwest—the hospital to which Camacho originally sought to take Obeid—was farther away from Obeid's home than Memorial Hermann Memorial City. And Obeid was stable during the ambulance ride to the hospital. Obeid was breathing normally, fully alert, and not in distress. *See Borrego v. City of El Paso*, 964 S.W.2d 954, 958 (Tex. App.—El Paso 1998, pet. denied) (holding no emergency situation where plaintiff was walking around scene of accident for ten to fifteen minutes before paramedics immobilized him on backboard).

Still yet, the Texas Peace Officer's Crash Report related to the collision includes an un-checked box indicating that there was not an emergency. *See Collins*, 2014 WL 3051231, at *7–8 (plaintiff could present fact issue as to "emergency exception" by presenting evidence that law enforcement officer was not responding

26

to emergency call or reacting to emergency situation). The mere fact that Camacho, a paramedic and an engineer/operator of an ambulance, was transporting Obeid to a hospital in an ambulance does not automatically render the situation an emergency. *See Borrego*, 964 S.W.2d at 958 ("[T]he mere fact that the EMS personnel were assisting [plaintiff] at the scene of an accident does not necessarily constitute an emergency situation.").

Taking all of the evidence together and viewing it in the light most favorable to appellees, we conclude that appellees have raised an issue of fact as to whether Camacho was responding to an emergency call or an emergency situation at the time of the collision. *Cf. Collins*, 2014 WL 3051231, at *6–8. Thus, we hold that the trial court did not err in denying the City's motion for summary judgment based on the "emergency exception."

We note that the City asserts, alternatively, that even if the initial emergency call or emergency situation had ceased, Camacho was reacting to a second emergency situation at the time of the collision because Obeid instructed Camacho to "change [the] destination while the ambulance was already en route to [one] hospital." According to the City, Camacho had to "make a very quick decision to exit the tollway and change direction . . . to ensure [that] Obeid got to the hospital [of her choice] with some urgency." Thus, "even if Obeid's health condition . . . no

27

longer [constituted] an emergency," "Camacho was nevertheless reacting to an emergency situation by changing course at Obeid's instruction."

In his affidavit, Camacho testified that Obeid's home was "equidistant from two hospitals that c[ould have] provide[d] [her with] cardiac care"—Memorial Hermann Memorial City and Memorial Hermann Southwest. Initially, Camacho started driving toward Memorial Hermann Memorial City, but Obeid "requested . . . [a] change [of] course" because she had previously been treated at Memorial Hermann Southwest. Upon Obeid's request, Camacho "had to make a very quick decision to exit the tollway [on which he was driving] and change direction."

According to Camacho, because the exits on the tollway on which he was driving were limited, "missing [an] exit would have added 15 minutes" onto the drive to the hospital. When trying to exit, Camacho chose a lane that had the fewest cars in line at the upcoming toll booth. But, as he approached the toll booth in the ambulance, he saw a sign that said that the lane he had selected was only to be used by "narrow cars." He then stopped the ambulance. He could not change lanes because the barrels connected by a cable in front of each toll booth prevented him from doing so. He considered backing up the ambulance far enough to change lanes, but believed that by doing so, he "would have posed a significant risk to other drivers exiting the tollway" because of his limited ability to see behind the ambulance while

28

driving. He believed that "backing up" the ambulance was a "riskier option." Thus, he decided to drive the ambulance forward at approximately five miles per hour "to minimize the impact if the ambulance were to collide with the toll booth."

As Camacho drove through the toll booth, he used the ambulance's side mirrors to ascertain whether it would fit through the "narrow" lane. Although the side mirrors "cleared" the toll booth, unbeknownst to Camacho, the lane was narrower at the bottom "so the bottom of the ambulance hit the toll booth." According to Camacho, about two minutes passed between the time Obeid told him to take her to Memorial Hermann Southwest and the time the ambulance hit the toll booth.

The City provides no pertinent authority to support its assertion that Camacho was reacting to an emergency situation at the time of the collision because Obeid requested that he transport her to a hospital different from the one to which he originally intended to take her. Camacho testified that the two hospitals that could provide Obeid with cardiac care were "equidistant" from Obeid's home. And although Camacho stated that he "had to make a very quick decision to exit the tollway [on which he was driving] and change direction" upon Obeid's request and that "missing th[e] exit would have added 15 minutes" onto the drive to the hospital, he does not state that the additional fifteen minutes would have negatively affected or worsened Obeid's condition. Further, Camacho did not state that he was required

29

to comply with Obeid's request to change the ambulance's destination; instead, he chose to honor her request. *Cf. Higginbotham v. Ritchie*, 367 S.W.2d 210, 212 (Tex. App.—Fort Worth 1963, no writ) (party cannot create own "sudden emergency").

As noted above, while transporting Obeid to the hospital, Camacho did not activate the ambulance's emergency lights or siren. During transport, Obeid's heart rate was normal and her pacemaker "was doing its job." There was no need for Obeid to drive "extra fast." We cannot conclude that the City's evidence is sufficient to show that Camacho was reacting to an emergency situation at the time of the collision because Obeid had instructed him to take her to a different hospital and the City did not meet its initial burden as to its alternative argument. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2).

We overrule the City's first issue.

**Motion to Dismiss**

In its second issue, the City argues that the trial court erred in denying its motion to dismiss because appellees' claims against it constitute health care liability claims and appellees failed to serve it with a statutorily-required expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001(a)(13), 74.351(a), (b).

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacio*s, 46 S.W.3d 873, 875 (Tex. 2001); *Cage v. Methodist Hosp.*, 470 S.W.3d

30

596, 600 (Tex. App.—Houston [1st Dist.] 2015, no pet.). That said, whether a claim constitutes a health care liability claim is a question of law that we review de novo. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019). In determining whether a claim constitutes a health care liability claim, we consider the entire record, including the pleadings, motions, and responses, and relevant evidence properly admitted. *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012).

Under the Texas Medical Liability Act ("TMLA"), a plaintiff whose claim constitutes a health care liability claim must serve an expert report, with a curriculum vitae for the expert whose opinion is offered, on a defendant physician or health care provider within 120 days of the filing of an answer by the defendant. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *see also Weems*, 575 S.W.3d at 360–61. If the plaintiff fails to timely serve an expert report, then on the motion of a defendant physician or health care provider, the trial court must dismiss the plaintiff's health care liability claim with prejudice. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *see also Weems*, 575 S.W.3d at 360–61. Here, appellees did not serve an expert report on the City at any time, so if appellees' negligence claims against the City constitute health care liability claims, their suit must be dismissed. *See Weems*, 575 S.W.3d at 360–61, 363 (because plaintiff did not serve expert report, if plaintiff asserted health care liability claim, suit must be dismissed with prejudice).

The TMLA defines a "[h]ealth care liability claim" as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (internal quotations omitted); *see also Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015). Thus, we consider three basic elements in determining whether a plaintiff's claim constitutes a health care liability claim: (1) whether the defendant is a physician or health care provider; (2) whether the claim at issue concerns treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety, or professional or administrative services directly related to health care; and (3) whether the defendant's act or omission complained of proximately caused the injury to the plaintiff.[18] *Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13). The TMLA creates a rebuttable presumption that a plaintiff's claim is a health care liability claim if it is brought against a physician or health care provider and "is based

---

[18] The parties do not appear to dispute that the City constitutes a health care provider or that the proximate causation element is met. Thus, our focus is on whether appellees' claims concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety, or professional or administrative services directly related to health care.

on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement."[19] *Loaisiga*, 379 S.W.3d at 256.

The City argues that appellees' claims against it constitute health care liability claims because they concern a departure from the accepted safety standards, there is a substantive nexus between the safety standards allegedly violated and the providing of health care, and appellees did not rebut the presumption that their claims constitute health care liability claims.

---

[19] For purposes of this memorandum opinion, we will presume, without deciding, that the rebuttable presumption applies to Obeid's negligence claim and to Hussein's negligence claim because the result is the same whether the presumption is applied or not. *See Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019) ("When a claim brought against a health care provider is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement, a rebuttable presumption arises that it is a health care liability claim for purposes of the [TMLA]." (internal quotations omitted)); *In re Baylor Coll. of Med.*, Nos. 01-19-00105-CV, 01-19-00142-CV, 2019 WL 3418504, at *1–3 (Tex. App.—Houston [1st Dist.] July 30, 2019, orig. proceeding) (mem. op.) (holding presumption applies when plaintiff's claim brought against health care provider and claim based on facts implicating defendant health care provider's conduct during course of "a patient's care, treatment, or confinement"; noting plaintiff not "[the] patient" (internal quotations omitted)). To the extent that appellees assert that the rebuttable presumption cannot be applied to a case involving a "safety[-]standard claim[]," we disagree. *See, e.g.*, *Ortiz v. St. Teresa Nursing & Rehab. Ctr., LLC*, 579 S.W.3d 696, 703 (Tex. App.—El Paso 2019, pet. denied) (involving safety-standard claim and discussing rebuttable presumption); *see also Mem'l Hermann Hosp. Sys. v. Galvan*, 434 S.W.3d 176, 185 (Tex. App.—Houston [14th Dist.] 2014) (although presumption does not apply to all potential health care liability claims, it applies to claims against health care provider that implicate defendant's conduct during course of "a patient's care, treatment, or confinement"), *rev'd on other grounds*, 476 S.W.3d 429 (Tex. 2015).

As stated above, a "[h]ealth care liability claim" is "a cause of action against a health care provider . . . for . . . [a] *claimed departure from accepted standards of . . . safety . . .* which proximately results in injury to . . . a claimant, whether the claimant's claim or cause of action sounds in tort or contract." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (emphasis added); *see also Ross*, 462 S.W.3d at 501. "[S]afety" is not defined by the TMLA. However, the Texas Supreme Court has stated that "safety" is given its common meaning as "the condition of being untouched by danger; not exposed to danger; secure from danger, harm or loss." *Ross*, 462 S.W.3d at 501 (internal quotations omitted). Using the statutory definition, an accepted safety-standard claim need not be directly related to the providing of health care to qualify as a health care liability claim. *Id.* at 504; *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005) ("[T]he Legislature's inclusion within the scope of the [TMLA] of claims based on breaches of accepted standards of 'safety' expands the scope of the statute beyond what it would be if it only covered medical and health care."). Instead, there need only be "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Ross*, 462 S.W.3d at 504; *see also Cage*, 470 S.W.3d at 602. This nexus depends on "whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to

34

provide for patient safety." *Ross*, 462 S.W.3d at 505; *see also Cage*, 470 S.W.3d at 602.

The Texas Supreme Court has set forth a list of non-exclusive considerations to help courts determine whether there is a substantive nexus between the safety standards allegedly violated and the providing of health care:

1.    Whether the alleged negligence occurred in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

2.    Whether the alleged injuries occurred in a place where patients were receiving care, so that the obligation of the provider to protect persons who require medical care was implicated;

3.    Whether the plaintiff was seeking or receiving health care when the alleged injuries occurred;

4.    Whether the plaintiff was providing or assisting in the providing of health care when the injuries occurred;

5.    Whether the alleged negligence arises from safety standards that are part of the professional duties owed by the health care provider;

6.    If an instrumentality was involved in the defendant's alleged negligence, whether it was a type used in the providing of health care; and

7.    Whether the alleged negligence implicated safety-related requirements set for health care providers by governmental or accrediting agencies.

*See Ross*, 462 S.W.3d at 505. When we examine these factors or considerations, we focus on the essence of the cause of action. *Bain v. Capital Senior Living Corp.*, No.

35

05-14-00255-CV, 2015 WL 3958714, at *3 (Tex. App.—Dallas June 30, 2015, pet. denied) (mem. op.). Is the claim an ordinary negligence claim or is the claim a health care liability claim as contemplated by the Legislature when it provided for health care liability claims in the TMLA? *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176 (Tex. 2012). The pivotal issue is whether the safety standards implicated the defendant's duties as a health care provider. *See Ross*, 462 S.W.3d at 505.

## A. Obeid

We first address whether Obeid's negligence claim against the City involves "a substantive nexus between the safety standards allegedly violated and the provision of health care" and thus constitutes a health care liability claim. *See Ross*, 462 S.W.3d at 504.

In the second amended petition, Obeid alleges that on May 26, 2016, she was riding in a City ambulance, driven by Camacho, an employee of the City, when the ambulance suddenly, and without warning, struck the concrete barrier of a toll booth. Obeid was "toss[ed]" and injured as a result of the ambulance's impact with the toll booth. Obeid alleges that Camacho was negligent in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact,

36

and attempting to drive a large ambulance through a narrow toll booth at an excessive speed.

Camacho testified, by affidavit, which the City attached to its motion to dismiss, that he is a certified paramedic and provides "advanced life support care." On May 26, 2016, he was the engineer/operator of Houston Fire-EMS ambulance. As part of his job duties, he operated units to emergencies using emergency lights and sirens, retrieved equipment, assisted and supervised the in-charge caregiver who provided care to patients, maintained a safe scene, mitigated risk at a scene, called for additional resources as necessary, and transported patients to facilities in a timely manner.

On May 26, 2016, Camacho's ambulance was dispatched to Obeid's home because Obeid was experiencing chest pains—a complaint that was "always treated as [a] worst-case scenario: a heart attack." Upon arrival at Obeid's home, Obeid complained of chest pains and rated her pain as an eight out of ten. An EKG was performed and revealed that Obeid was experiencing atrial fibrillation. Atrial fibrillation means that "the upper chamber of [Obeid's] heart (the atrium) [was] quivering" and which could cause clots that "could travel to the brain and cause a stroke, travel to the lungs and cause a . . . [PE]," or "travel to the heart" and cause a heart attack. Obeid needed to be taken to a hospital because of the somewhat urgent and potentially life-threatening nature of her medical condition. Obeid was thus

37

placed in the ambulance to be transported to a hospital. While transporting Obeid to the hospital, Camacho hit a toll booth.

In her response to the City's first set of interrogatories, which the City attached to its motion to dismiss, Obeid stated that Hussein called for emergency assistance on Obeid's behalf because she was experiencing chest pains and thought she was having a heart attack. In her response to the City's first set of admissions, which the City attached to its motion to dismiss, Obeid admitted that: (1) she was experiencing chest pains on May 26, 2016; (2) emergency assistance was called because she needed medical assistance; (3) she believed at the time that her life could be in danger, she needed urgent medical assistance, and her situation was "an emergency"; (4) she saw "flashing lights" and heard sirens when the ambulance arrived at her home; and (5) she was inside the ambulance because she was being transported to a hospital for medical assistance.

The Texas Peace Officer's Crash Report, which appellees attached to their response to the City's motion to dismiss, states that "[w]hile transporting a patient" to a hospital "for [a] heart problem," the ambulance "tried to go through [a] toll road lane but could not fit through [the] lane and hit [a] barrier on the right side of the ambulance." Obeid is listed as the "patient" on the report, and the report states that she was "hooked [up] to [an] IV for heart treatment" while in the ambulance. The report also notes that while Obeid was being transported to the hospital at least one

38

other paramedic was in the back of the ambulance with her. Hussein's statement[20] in the report is as follows:

> I called the ambulance around 12 pm for my mother . . . Obeid['s] chest pain. After checking we were going to [Memorial Hermann] Memorial City . . . we wanted to go to Memorial H[e]rmann Southwest and the driver tr[ied] to get into the small EZ tag lane and we hit the wall from both sides. The ambulance . . . was stuck there. I [remember] falling into the ground and hurting my belly and both [of] my knees and [Obeid] hurt her hand and couldn't breathe and [had] back pain [and] her head hurt[]. [Obeid] had [a] seatbelt on, but I didn't since no one told me to.

(Internal quotations omitted.)

Obeid, in her declaration, which appellees attached to their response to the City's motion to dismiss, stated that on May 26, 2016, she was at home with Hussein when she began experiencing chest pains. Hussein called for emergency assistance to "ensure that [Obeid] was ok." An ambulance arrived at her home with its emergency lights and sirens activated. Obeid rode in the ambulance to a hospital, and during the drive, Cooper, a paramedic, and interns provided medical treatment to her in the ambulance. Obeid was in the ambulance when it struck the toll booth, and she received bruising and abrasions on her left hand as a result of the impact.

Finally, Hussein, in her declaration, which appellees attached to their response to the City's motion to dismiss, stated that on May 26, 2016, she called for

---

[20] Hussein's statement in the report was a joint statement for her and Obeid because Obeid, at the time, was "hooked [up] to [an] IV for heart treatment."

emergency assistance because Obeid was experiencing chest pains and Hussein wanted "911 to come . . . check her out."

Here, most of the *Ross* factors[21] favor concluding that Obeid's negligence claim against the City constitutes a health care liability claim. *See Ross*, 462 S.W.3d at 504–05; *see also Cage*, 470 S.W.3d at 602–03. Obeid does not dispute that the second and third factors weigh in favor of her claim being classified as a health care liability claim, and we agree. Obeid was injured in the collision while being transported in an ambulance to a hospital for treatment for her heart condition. And she received medical treatment from a paramedic while inside the ambulance. As to Obeid, the second and third *Ross* factors are met. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10) ("Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." (internal quotations omitted)); *see also Coci v. Dower*, 585 S.W.3d 652, 654, 656 (Tex. App.—Eastland 2019, pet. denied) (noting inside of ambulance can constitute "a health care setting"); *cf. Kindred Healthcare, Inc. v. Morales*, 499 S.W.3d 475, 480 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (considering whether plaintiff was seeking or receiving health care when he was injured).

---

[21] The fourth and seventh *Ross* factors are inapplicable here. *See Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 505 (Tex. 2015).

40

As to the first factor, Camacho's alleged negligence in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed occurred in the course of him performing a task with the purpose of protecting Obeid from harm. Specifically, Camacho's allegedly negligent acts or omissions occurred while he was transporting Obeid to the hospital in an ambulance so that she could receive medical treatment for her somewhat urgent and potentially life-threatening medical condition. *See Taton v. Taylor*, No. 02-18-00373-CV, 2019 WL 2635568, at *6–7 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) (substantive nexus existed between allegedly violated safety standards and provision of health care where plaintiff injured while being transported in handicap accessible van); *Bain*, 2015 WL 3958714, at *4 (alleged misuse of wheelchair lap belt so that plaintiff could be safely transported constituted "a task performed with the purpose of protecting [patients] from harm"). As to Obeid, the first *Ross* factor is met.

Regarding the sixth factor, we must consider whether the ambulance—the instrumentality involved in Camacho's alleged negligence—constituted an instrumentality used in the providing of health care. We agree with appellees'

41

assertion that an ambulance does not automatically constitute an instrumentality used in the providing of health care,[22] but related to Obeid, it does in this case.

Here, the ambulance[23] was dispatched to Obeid's home after Hussein called for emergency assistance because Obeid was experiencing chest pains, needed to be "check[ed] . . . out," and required medical assistance. Ultimately, after Obeid was evaluated by paramedics at her home, it was determined that she was experiencing atrial fibrillation and she needed to be transported to a hospital because her medical condition at the time was somewhat urgent and potentially life-threatening in nature. Obeid, "a patient," was specifically put in the ambulance for transportation to a hospital so that she could receive medical treatment. While in the ambulance and en route to a hospital, Obeid was "hooked [up] to [an] IV for heart treatment." Cooper, a paramedic, and interns provided medical treatment to Obeid in the ambulance. Under these circumstances, as to Obeid, the ambulance, which was being used at the time to transport a patient, who had called for emergency assistance, to a hospital for further medical evaluation and treatment, constituted an instrumentality used in the providing of health care, and the sixth *Ross* factor is met.

---

[22]    *See Coci v. Dower*, 585 S.W.3d 652, 656 (Tex. App.—Eastland 2019, pet. denied) ("We do not believe that the fact that an ambulance was involved automatically morphs all claims into health care liability claims.").

[23]    *See Ambulance*, OXFORD ENGLISH DICTIONARY (7th ed. 2012) (defining "ambulance" as "a special vehicle used to take sick or injured people to the hospital").

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10) ("Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." (internal quotations omitted)); *Taton*, 2019 WL 2635568, at *6 (wheelchair used to transport patient constituted type of instrumentality used in providing of health care); *Phillips v. Jones*, No. 05-15-00005-CV, 2016 WL 80561, at *2 (Tex. App.—Dallas Jan. 7, 2016, no pet.) (mem. op.) (doctor's examination room and examination table used to treat plaintiff who had sought medical services of doctor constituted instrumentality used in providing of health care); *Bain*, 2015 WL 3958714, at *4; *cf. Shah v. Sodexo Servs. of Tex. Ltd. P'ship*, 492 S.W.3d 413, 418 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (beverage cart did not constitute "an instrumentality used in [the] providing [of] health care"); *Lance Thai Tran, DDS, PA v. Chavez*, No. 14-14-00318-CV, 2015 WL 2342564, at *4 (Tex. App.—Houston [14th Dist.] May 14, 2015, no pet.) (mem. op.) (mop did not constitute type of instrumentality particularly used in providing of health care); *Valley Reg'l Med. Ctr. v. Camacho*, No. 13-14-00004-CV, 2015 WL 2353287, at *4 (Tex. App.—Corpus Christi–Edinburg May 14, 2015, no pet.) (mem. op.) (hospital's automatic closing door did not constitute type of instrumentality used in providing of health care).

Finally, as to the fifth factor, Obeid alleged that Camacho was negligent in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed. These constitute negligence allegations "based on safety standards arising from the professional duties owed by the health care provider." *See Tex. Health Res. v. Coming Attractions Bridal & Formal, Inc.*, 552 S.W.3d 335, 341 (Tex. App.—Dallas 2018), *aff'd*, 595 S.W.3d 659 (Tex. 2020); *see also* TEX. HEALTH & SAFETY CODE ANN. ch. 773 ("Emergency Medical Health Care Act"); *id.* § 773.002 ("The purpose of this chapter is to provide for the prompt and efficient transportation of sick and injured patients, after necessary stabilization, and to encourage public access to that transportation in each area of the state."); TEX. TRANSP. CODE ANN. § 546.005 (stating operator of emergency vehicle has duty to operate vehicle with appropriate regard for safety of all persons). The fifth *Ross* factor is met.

As to Obeid, although not all of the *Ross* factors apply to her claim, the factors that do apply show that Obeid's negligence claim against the City involves "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Ross*, 462 S.W.3d at 504; *see also Cage*, 470 S.W.3d at 602.

44

We note that Obeid argues that her negligence claim cannot constitute a health care liability claim because "there is absolutely no necessity for expert testimony from a health care professional to resolve [her] claim[]." (Internal quotations omitted.) Although how much expert testimony from a health care professional is necessary to support a plaintiff's claim is a relevant consideration in deciding whether a safety-standard claim constitutes a health care liability claim, whether medical expert testimony will be needed to establish a plaintiff's claim is not determinative of the issue. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 182; *Pallares v. Magic Valley Elec. Coop., Inc.*, 267 S.W.3d 67, 74–75 (Tex. App.—Corpus Christi–Edinburg 2008, pet. denied). A claim may still be a health care liability claim even when expert testimony is not required. *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182; *Sherman v. HealthSouth Specialty Hosp., Inc.*, 397 S.W.3d 869, 874–75 (Tex. App.—Dallas 2013, pet. denied). Additionally, in the second amended petition, Obeid alleges that she was "toss[ed]" and injured when ambulance hit the concrete barrier of the tollbooth. Thus, expert testimony about how to properly secure a patient in an ambulance for transportation to a hospital may be necessary. *See, e.g.*, *Assisted Living Concepts, Inc. v. Stark*, No. 07-10-0228-CV, 2010 WL 4740345, at *3 (Tex. App.—Amarillo Nov. 23, 2010, no pet.) (mem. op.) (expert testimony would be required as to whether patient should have been restrained, whether restraint was appropriate, and what degree of restraint to be applied).

Obeid bore the burden of rebutting the presumption that her negligence claim against the City was a health care liability claim. *See Weems*, 575 S.W.3d at 363. She has not done so. We conclude that Obeid's negligence claim constitutes a health care liability claim. Because Obeid's claim constitutes a health care liability claim and Obeid failed to serve the City with a statutorily-required expert report, we hold that the trial court erred in denying the City's motion to dismiss as to Obeid.

## B.     Hussein

We next address whether Hussein's negligence claim against the City involves "a substantive nexus between the safety standards allegedly violated and the provision of health care" and thus constitutes a health care liability claim. *See Ross*, 462 S.W.3d at 504.

In the second amended petition, Hussein alleges that on May 26, 2016, she was riding in a City ambulance, driven by Camacho, an employee of the City, when the ambulance suddenly, and without warning, struck the concrete barrier of a toll booth. Hussein was "toss[ed]" and injured as a result of the ambulance's impact with the toll booth. Hussein, like Obeid, alleges that Camacho was negligent in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed.

46

Hussein, in her declaration, stated that on May 26, 2016, she was at home with Obeid when Obeid began experiencing chest pains. Hussein called for emergency assistance for "911 to come to the [home] and check [Obeid] out." Hussein further stated that "[a]t no time was [she] under the medical care of ambulance personnel, or anyone else" and she "received no medical treatment whatsoever while at [Obeid's home] or in the ambulance." She also did not provide or assist in providing health care to any person. When the ambulance "struck the barrier wall," Hussein was "knocked to the floor of the ambulance and sustained injuries."

Obeid, in her declaration, stated that on May 26, 2016, she was at home with Hussein. Hussein called for emergency assistance because Obeid was experiencing chest pains and Hussein wanted to "ensure that [Obeid] was ok."

The Texas Peace Officer's Crash Report states that there were six people in the ambulance at the time of the crash: (1) Camacho—the driver, (2) Obeid, (3) Hussein, (4) Cooper—a paramedic, (5) Miller, and (6) Manning. Obeid, Hussein, Cooper, Miller, and Manning were all in the back of the ambulance at the time of the crash. However, the report lists Obeid as "[the] patient" being transported to the hospital for "for [a] heart problem." Hussein's statement in the report is as follows:

> I called the ambulance around 12 pm for my mother . . . Obeid['s] chest pain. After checking we were going to [Memorial Hermann] Memorial City . . . we wanted to go to Memorial H[e]rmann Southwest and the driver tr[ied] to get into the small EZ tag lane and we hit the wall from

47

both sides. The ambulance . . . was stuck there. I [remember] falling into the ground and hurting my belly and both [of] my knees and [Obeid] hurt her hand and couldn't breathe and [had] back pain [and] her head hurt[]. [Obeid] had [a] seatbelt on, but I didn't since no one told me to.

In contrast to Obeid's claim, most of the *Ross* factors do not weigh in favor of concluding that Hussein's negligence claim against the City constitutes a health care liability claim. *See Ross*, 462 S.W.3d at 504–05; *see also Cage*, 470 S.W.3d at 602–03. The parties do not appear to dispute that Hussein merely accompanied Obeid, her mother, in the ambulance as Obeid was being transported to the hospital. Hussein was not the patient, did not receive health care, and did not provide, or assist in the providing of, health care when she was injured. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10) ("Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." (internal quotations omitted)); *cf. Morales*, 499 S.W.3d at 480 (considering whether plaintiff was seeking or receiving health care when he was injured). The third and fourth *Ross* factors are not met.

As to the sixth factor, related to Hussein, we must consider whether the ambulance—the instrumentality involved in Camacho's alleged negligence—constituted an instrumentality used in the providing of health care. As stated above, an ambulance does not automatically constitute an instrumentality used in the

providing of health care. *See Coci*, 585 S.W.3d at 656 ("We do not believe that the fact that an ambulance was involved automatically morphs all claims into health care liability claims."); *cf. Houston Methodist Willowbrook Hosp. v. Ramirez*, 539 S.W.3d 495, 500–01 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (although injury occurred in hallway of hospital outside radiology department, no instrumentality used to provide health care was implicated).

Although an ambulance is defined as "a vehicle for taking sick or injured people to and from [a] hospital." it was not used in such a manner related to Hussein. *See Ambulance*, Oxford English Dictionary (7th ed. 2012). The ambulance was dispatched to Obeid's home because *Obeid* was experiencing chest pains, needed to be "check[ed] . . . out," and required medical assistance. After Obeid was evaluated by paramedics at her home, it was determined that she was experiencing atrial fibrillation and needed to be transported to a hospital because her medical condition at the time was somewhat urgent and potentially life-threatening in nature. Obeid, "[the] patient," was put in the ambulance to be transported to a hospital so that she could receive medical treatment, and Obeid received medical treatment from Cooper, a paramedic, and interns while in the ambulance. Hussein, however, never received any medical treatment in the ambulance—she was merely a passenger along for the ride. Under these circumstances, as to Hussein, a non-patient, who had not called for emergency assistance for herself and who was not being taken to a

49

hospital for medical evaluation and treatment, the ambulance did not constitute an instrumentality used in the providing of health care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10) ("Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." (internal quotations omitted)); *Camacho*, 2015 WL 2353287, at *1–2, *4 (as to non-patient plaintiff, who was visiting family-member patient at hospital and was struck with automatic sliding door, sliding door did not constitute type of instrumentality used in providing of health care). As to Hussein, the sixth *Ross* factor is not met.

As to the seventh factor, here, there is nothing showing that the alleged negligence by Camacho in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed implicated safety-related requirements set for health care providers by governmental or accrediting agencies. Thus, the seventh *Ross* factor is not met.

We do note, as to Hussein, that the first and second *Ross* factors are met because Camacho's alleged negligent acts and omissions occurred in the course of him performing tasks with the purpose of protecting Obeid, a patient, from harm and

50

Hussein's alleged injuries occurred in a place where Obeid was receiving care. *See Coci*, 585 S.W.3d at 654, 656 (noting inside of ambulance can constitute "a health care setting").

And as to the fifth factor, Hussein, like Obeid, alleged that Camacho was negligent in failing to keep a proper lookout, failing to control the speed of the ambulance, failing to drive at a safe speed, failing to drive in a single lane, failing to turn the ambulance to avoid the impact, and attempting to drive a large ambulance through a narrow toll booth at an excessive speed. These constitute negligence allegations "based on safety standards arising from the professional duties owed by the health care provider" because the City, as a health care provider, owed professional duties to keep all occupants of its ambulances safe. *See Tex. Health Res.*, 552 S.W.3d at 341; *see also* TEX. TRANSP. CODE ANN. § 546.005 (stating operator of emergency vehicle has duty to operate vehicle with appropriate regard for safety of all persons). The fifth *Ross* factor is met.

In sum, although some of the *Ross* factors are met as to Hussein, on balance, the *Ross* factors do not show that Hussein's negligence claim against the City involves "a substantive nexus between the safety standards allegedly violated and the provision of health care."[24] *Ross*, 462 S.W.3d at 504; *see also Cage*, 470 S.W.3d

---

[24] To the extent that the City argues that Hussein's negligence claim constitutes a health care liability claim because the allegations "implicate[] the necessity of expert testimony," we again note that whether medical expert testimony will be

51

at 602. And our conclusion is consistent with the recent opinion by the Eastland Court of Appeals in *Coci*.

In *Coci*, the plaintiff, a mother, was injured in an ambulance accident while her daughter was being transported in an ambulance from one hospital to another for a medical procedure. 585 S.W.3d at 654. The mother accompanied her daughter, the patient, in the ambulance, but the mother was not a patient or the recipient of any health care. *Id.* While en route to the hospital, the ambulance left the roadway and collided with the protective barrier in the median, and the mother was injured. *Id.* She brought suit against the ambulance company and the driver for negligence, alleging that the driver had (1) failed to keep a proper outlook, (2) failed to turn the ambulance to avoid the collision, (3) failed to give adequate warning, (4) failed to adequately use the brakes, (5) driven at an unsafe speed, (6) failed to maintain a safe distance, (7) failed to maintain a single lane, and (8) failed to monitor oncoming traffic. *Id.*

On appeal, the Eastland Court of Appeals addressed whether the mother's negligence claims against the ambulance company and driver constituted health care liability claims so that she was required to serve a statutorily-required expert report.

---

needed to establish a plaintiff's claim is not determinative of the issue. *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012); *Pallares v. Magic Valley Elec. Coop., Inc.*, 267 S.W.3d 67, 74–75 (Tex. App.—Corpus Christi–Edinburg 2008, pet. denied).

*Id.* The ambulance company and the driver asserted that the mother's claims implicated the "safety" portion of the definition of a health care liability claim. *Id.* at 654–57; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (defining "[h]ealth care liability claim" (internal quotations omitted)). But, after reviewing the *Ross* factors, the court of appeals held that the claims of the mother—a mere passenger in the ambulance—did not involve a substantive nexus between the safety standards allegedly violated and the provision of health care and did not constitute health care liability claims.[25] *Coci*, 585 S.W.3d at 654–57.

---

[25] We note that the Eastland Court of Appeals looked at our original March 19, 2019 memorandum opinion in this case in determining whether the mother's negligence claims constituted health care liability claims. Although we are now withdrawing that opinion, the decision as to whether Hussein's negligence claim against the City constitutes a health care liability claim remains unchanged. In other words, we continue to hold that Hussein—a mere passenger in an ambulance—did not allege a health care liability claim against the City. Thus, the Eastland Court of Appeals' citation to our original March 19, 2019 memorandum opinion for a similar holding is not misguided or misplaced.

Turning back to this case, Hussein bore the burden of rebutting the presumption that her negligence claim against the City was a health care liability claim. *See Weems*, 575 S.W.3d at 363. And she has done so. We conclude that Hussein's negligence claim does not constitute a health care liability claim. Because Hussein's claim does not constitute a health care liability claim and Hussein was not required to serve the City with a statutorily-required expert report, we hold that the trial court did not err in denying the City's motion to dismiss as to Hussein.

We sustain the City's second issue in part and overrule the City's second issue in part.

## Conclusion

We affirm the portion of the trial court's order that denied the City's motion for summary judgment. We reverse the portion of the trial court's order that denied the City's motion to dismiss as to Obeid's claim, and we render judgment that Obeid's claim against the City be dismissed with prejudice from the proceeding. We affirm the portion of the trial court's order that denied the City's motion to dismiss as to Hussein's claim and remand the case to the trial court for further proceedings consistent with this opinion.

Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.